# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 20, 2012

No. 11-50097

Lyle W. Cayce
Clerk

PERVASIVE SOFTWARE INC.,

Plaintiff-Appellant

v.

LEXWARE GMBH & COMPANY KG,

Defendant-Appellee

Appeal from the United States District Court
for the Western District of Texas

Before DENNIS, CLEMENT, and HIGGINSON, Circuit Judges.

DENNIS, Circuit Judge:

The plaintiff-appellant, Pervasive Software Inc. ("Pervasive"), a Delaware corporation having its principal office in Austin, Texas, sued defendant-appellee, Lexware GmbH & Co. Kg ("Lexware"), a corporation organized under the laws of the Federal Republic of Germany, for damages and injunctive relief on the basis of breach of contract, quantum meruit, unjust enrichment, and conversion in a Texas state court. Lexware removed the case to the federal district court, and that court, in response to Lexware's motion, dismissed the case for lack of personal jurisdiction over Lexware. Pervasive appealed. We affirm, concluding that Pervasive has failed to establish a prima facie case that Lexware had

No. 11-50097

minimum contacts with Texas to support the exercise of either specific or general personal jurisdiction over Lexware.

## I. Facts and Procedural History

Pervasive, formerly named Btrieve Technologies, Inc., is a computer software manufacturer, incorporated under the law of Delaware, with its principal place of business in Austin, Texas. Pervasive sells its software products globally, has employees and offices in Germany, Europe, and elsewhere, and conducts business worldwide. Lexware is a German software developer based in Freiburg, Germany. It produces German tax and financial software programs for German taxpayers exclusively in the German language.

Among its software products, Pervasive has developed and sold globally the Btrieve Client Engine Version 6.15 ("Btrieve" or "Btrieve software").[1] In 1994, Lexware purchased a copy of Btrieve software in Germany from SOS Software Service GmbH ("SOS"), a third-party German software distributor.[2] Lexware paid 1,327.25 deutschmarks to SOS for Btrieve. Included in the software package was a license agreement, the Derivative Software License Agreement ("DSLA"). By purchasing and using the Btrieve software package, Lexware signified that it entered into the DSLA with Pervasive. The DSLA

---

[1] Btrieve is a software product that provides a database module that stores, edits, and searches data, and was produced with the purpose of being purchased and used by other software developers, who incorporate Btrieve into their own derivative software products.

[2] The parties disagree about whether this software sale took place in 1994 or 1996. "When, as here, the district court conducted no evidentiary hearing, the party seeking to assert jurisdiction must present sufficient facts as to make out only a prima facie case supporting jurisdiction. We must accept as true that party's uncontroverted allegations, and resolve in its favor all conflicts between the facts contained in the parties' affidavits and other documentation." *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000) (citations omitted). Although the date of the sale is not material, we resolve the conflict in favor of Pervasive.

No. 11-50097

specified the terms and conditions of Lexware's Btrieve software license and contained a Texas choice-of-law clause. The DSLA was for a term of one year, to be renewed automatically until one party terminated the agreement. The DSLA did not require Lexware to make additional payments or royalties to Pervasive, and under the DSLA Pervasive had no obligation to provide Lexware with ongoing technical support or assistance for Btrieve. Two forms accompanied the DSLA: (1) a request that the purchaser identify the product that it purchased; and (2) a request that the purchaser indicate the product name, category, and description of its derivative products. Both forms requested that they be completed and mailed to Pervasive's office in Austin, Texas. According to Pervasive, Lexware did not return these forms.

Lexware incorporated Btrieve into several of its products, German financial and tax software programs that were designed to assist German speaking taxpayers in preparing their German tax returns. The programs were not available in English. Pervasive did not agree to assist Lexware in incorporating Btrieve into its products or provide Lexware any technical assistance with Btrieve.

In 1999 and 2000, Pervasive and Lexware entered into a second, separate license agreement, the European Manufacturing Partner Agreement (EMPA). The EMPA involved a different and new Pervasive product line, the PSQL products. The parties negotiated and executed this agreement during several in-person meetings of their representatives in Germany. The EMPA required Lexware to make monthly reports to Pervasive and to incur a royalty fee to Pervasive each time Lexware sold a derivative product containing PSQL. Lexware made a one-time, non-refundable prepayment to Pervasive from which

No. 11-50097

the royalty fees were to be deducted. In 2002, Lexware released a new German taxpayer product line incorporating PSQL but discontinued it less than one year later because it was commercially unsuccessful. The EMPA had an initial three-year term that Lexware did not extend. In 2000, Pervasive and Lexware negotiated two addenda to the EMPA. The first ("Addendum 1") set forth Lexware's agreement to purchase from Pervasive 7,500 enabling technology user seats for PSQL, and contained provisions for reporting requirements and royalty fee payments. Lexware prepaid a fee of $125,250 for the 7,500 enabling seats. Addendum 1 to the EMPA was executed by the parties effective June 30, 2000. The second addendum ("Addendum 2") governed an Educational Grant Program. These addenda did not purport to amend or alter the DSLA. In 2006, 2008, and 2009, Lexware purchased three additional items for download from the Pervasive website that were not related to the Btrieve software it bought from SOS in 1994.

Pervasive and Lexware did not communicate directly with each other until 1999, when they began negotiations in respect to the EMPA. They then communicated several times between 1999 and 2003 regarding the EMPA and Lexware's reporting and royalty fee requirements. In 2002, Lexware asked Pervasive for a certificate that it was a U.S. taxpayer so as to enable Lexware to obtain an exemption from German taxes in connection with its payment of royalty fees under the EMPA. In 2003, Lexware asked Pervasive for certification that Pervasive was a U.S. corporation for the purposes of U.S. federal taxation. These requests were not related to the DSLA and pertained only to the EMPA and Addendum 1. Pervasive supplied the certificate of its U.S. taxpayer status to Lexware in June 2003. The companies did not communicate again until 2007,

No. 11-50097

when Lexware requested a price quote for a new version of PSQL; the e-mail was forwarded to Pervasive's German representatives, one of whom then called Lexware to discuss PSQL and Btrieve. Lexware did not purchase the new version of PSQL. In 2009, Lexware contacted Pervasive and requested the Btrieve Ultimate Patch or update, but Pervasive ultimately did not provide Lexware with that software patch or update.

Lexware does not have an office, own property, or have agents or employees in Texas, and it does not promote, market, or sell its products inside Texas. Its products are specifically designed for the German taxpayer market and are only available in the German language. Pervasive did not assist Lexware in incorporating Btrieve into its German taxpayer products or provide it with any other technical support. Lexware has an interactive website, using only the German language, that allows customers to purchase and download free trials of Lexware's software products. The website is accessible worldwide, including in Texas. Lexware has sent fifteen internet orders to twelve Texas billing or shipping addresses since 2007. Lexware's materials may also be purchased on several third-party vendor websites, which are accessible by persons in Texas. Lexware books are available for purchase on Amazon's U.S. website.

Pervasive describes itself as "a global leader in embeddable data management and data integration software," and has sold its products to customers in more than 150 countries. It has an interactive website that is accessible worldwide and in Germany, and it has used foreign third-party distributors. Most of Pervasive's offices are in Texas, but the company maintains a European Service and Support Center in Dublin, Ireland, and has several

No. 11-50097

offices in Japan and Europe, including in Germany. Pervasive employed two German resident representatives, who used a German e-mail address (pervasive.de) to contact Lexware. Many of Pervasive's communications with Lexware were in German. Lexware representatives also used German e-mail addresses (lexware.de).

In 2008, Pervasive representatives e-mailed Lexware, in the German language, to request the return of the Btrieve master CD and key generator.[3] Lexware replied, promising to handle the request but asking for more information about when and to whom Pervasive gave the CD and key generator. The record does not reflect whether Pervasive supplied Lexware with this information. In 2009, Pervasive's German representatives requested that Lexware report on its distribution of Lexware software products that incorporated Btrieve. Lexware refused on grounds that the DSLA did not obligate Lexware to make such reports or to pay Pervasive any royalty on the sale of Lexware products. Pervasive then contacted Lexware to terminate the DSLA. When Lexware rejected its demand, Pervasive sent Lexware a cease-and-desist letter. On March 26, 2010, Pervasive filed a complaint against Lexware in the 200th Judicial District of Travis County, Texas, seeking damages and injunctive relief. Pervasive raised four causes of action. First, Pervasive claimed that Lexware breached its contractual obligations under the DLSA. Pervasive also claimed that it was entitled to the fair value of Lexware's use of Btrieve

---

[3] Neither party has provided a description of these items. The Btrieve master CD was likely the CD on which Lexware's copy of Btrieve was stored. Neither party explains the exact nature of the "key generator." Although the record does not state this, we assume that the CD and key generator were contained in the Btrieve product package that Lexware purchased from SOS in 1994.

No. 11-50097

under quantum meruit and unjust enrichment. Finally, Pervasive claimed that Lexware committed the tort of conversion by wrongfully exercising dominion and control over Btrieve. Lexware removed the case to the United States District Court for the Western District of Texas and filed motions to dismiss for lack of personal jurisdiction and failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(2), 12(b)(6). The district court granted Lexware's 12(b)(2) motion, and Pervasive appealed.

## II. Discussion

### A. Standards of Review

We review de novo a district court's determination that it lacks personal jurisdiction. *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 869 (5th Cir. 2000). As the party seeking to invoke the power of the court, Pervasive "bears the burden of establishing jurisdiction but is required to present only *prima facie* evidence." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006); *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). "In determining whether a *prima facie* case exists, this Court must accept as true [the Plaintiff's] uncontroverted allegations, and resolve in [its] favor all conflicts between the [jurisdictional] facts contained in the parties' affidavits and other documentation." *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004) (alterations in original) (quoting *Nuovo Pigone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)) (internal quotation marks omitted).

### B. Personal Jurisdiction

### 1. General Principles

No. 11-50097

A federal court sitting in diversity must satisfy two requirements to exercise personal jurisdiction over a nonresident defendant. First, the forum state's long-arm statute must confer personal jurisdiction. Second, the exercise of jurisdiction must not exceed the boundaries of the Due Process Clause of the Fourteenth Amendment. *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999). Because Texas's long-arm statute has been interpreted to extend to the limits of due process, we only need to determine whether subjecting Lexware to suit in Texas in this case would be consistent with the Due Process Clause of the Fourteenth Amendment. *Id.*

The Due Process Clause of the Fourteenth Amendment protects a corporation, as it does an individual, against being made subject to the binding judgments of a forum with which it has established no meaningful "contacts, ties, or relations." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945). Thus, "[t]he Due Process Clause . . . sets the outer boundaries of a state tribunal's authority to proceed against a defendant." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853 (2011) (citing *Shaffer v. Heitner*, 433 U.S. 186, 207 (1977)). "The canonical opinion in this area remains [*International Shoe*], in which we held that a State may authorize its courts to exercise personal jurisdiction over an out-of-state defendant if the defendant has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe*, 326 U.S. at 316 (second alteration in original) (internal quotation marks omitted)).

"Endeavoring to give specific content to the 'fair play and substantial justice' concept, the Court in *International Shoe* classified cases involving

out-of-state corporate defendants. First, as in *International Shoe* itself, jurisdiction unquestionably could be asserted where the corporation's in-state activity is 'continuous and systematic' and *that activity gave rise to the episode-in-suit.*" *Id.* (quoting *Int'l Shoe*, 326 U.S. at 317). "Further, the Court observed, the commission of certain 'single or occasional acts' in a State may be sufficient to render a corporation answerable in that State with respect to those acts, though not with respect to matters unrelated to the forum connections." *Id.* (quoting *Int'l Shoe*, 326 U.S. at 318). "The heading courts today use to encompass these two *International Shoe* categories is 'specific jurisdiction.' Adjudicatory authority is 'specific' when the suit 'aris[es] out of or relate[s] to the defendant's contacts with the forum.'" *Id.* (alterations in original) (internal citation omitted) (quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). "Specific jurisdiction . . . depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* at 2851 (alteration in original) (quoting Arthur T. von Mehren & Donald T. Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis*, 79 Harv. L. Rev. 1121, 1136 (1966)).

"*International Shoe* distinguished from cases that fit within the 'specific jurisdiction' categories, 'instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.'" *Id.* at 2853 (alteration in original) (quoting *Int'l Shoe*, 326 U.S. at 318). "Adjudicatory authority so grounded is today called 'general jurisdiction.'" *Id.* (quoting *Helicopteros*, 466 U.S. at 414 n.9). "For an individual, the paradigm

No. 11-50097

forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Id.* at 2853-54 (citing Lea Brilmayer et al., *A General Look at General Jurisdiction*, 66 Tex. L. Rev. 721, 728 (1988)).

"Since *International Shoe*, this Court's decisions have elaborated primarily on circumstances that warrant the exercise of specific jurisdiction, particularly in cases involving 'single or occasional acts' occurring or having their impact within the forum State. As a rule in these cases, this Court has inquired whether there was 'some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' *Hanson v. Denckla*, [357 U.S. 235, 253 (1958)]. *See e.g.*, *World-Wide Volkswagen Corp. v. Woodson*, [444 U.S. 286 (1980)] (Oklahoma court may not exercise personal jurisdiction 'over a nonresident automobile retailer and its wholesale distributor in a products-liability action, when the defendants' only connection with Oklahoma is the fact that an automobile sold in New York to New York residents became involved in an accident in Oklahoma'); *Burger King Corp. v. Rudzewicz*, [471 U.S. 462, 474-75 (1985)] (franchisor headquartered in Florida may maintain breach-of-contract action in Florida against Michigan franchisees, where agreement contemplated ongoing interactions between franchisees and franchisor's headquarters); *Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cnty.*, [480 U.S. 102, 105 (1987)] (Taiwanese tire manufacturer settled product liability action brought in California and sought indemnification there from Japanese valve assembly manufacturer; Japanese company's 'mere awareness . . . that the components it manufactured, sold, and delivered outside the United States would reach the

10

forum State in the stream of commerce' held insufficient to permit California court's adjudication of Taiwanese company's cross-complaint); *id.*, at 109, 107 S. Ct. 1026 (opinion of O'Connor, J.); *id.*, at 116–117, 107 S. Ct. 1026 (Brennan, J., concurring in part and concurring in judgment)." *Id.* at 2854 (first and last alterations in original).

## 2. Lack of Specific Jurisdiction—Breach of Contract, Unjust Enrichment, and Quantum Meruit Claims

Specific jurisdiction requires a plaintiff to show that: "(1) there are sufficient (i.e., not 'random fortuitous or attenuated') pre-litigation connections between the non-resident defendant and the forum; (2) the connection has been purposefully established by the defendant; and (3) the plaintiff's cause of action arises out of or is related to the defendant's forum contacts. Once [the] plaintiff makes that showing, the defendant can then defeat the exercise of specific jurisdiction by showing (4) that it would fail the fairness test, i.e., that the balance of interest factors show that the exercise of jurisdiction would be unreasonable." 1 Robert C. Casad & William B. Richman, Jurisdiction in Civil Actions § 2-5, at 144 (3d ed. 1998) [hereinafter Casad & Richman] (footnote citing cases omitted); *see also McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009); *Seiferth*, 472 F.3d at 271; *Jones v. Petty-Ray Geophysical, Geosource, Inc.*, 954 F.2d 1061, 1068 & n.9 (5th Cir. 1992).

In respect to Pervasive's breach of contract, unjust enrichment, and quantum meruit claims, Pervasive has not made a prima facie showing of any act by which Lexware purposefully availed itself of the privilege of conducting activities within the forum state of Texas, so as to invoke the benefits and protections of its laws. Accepting as true the facts alleged by Pervasive, all of

No. 11-50097

Lexware's acts giving rise to Pervasive's claims against Lexware took place in Germany, not in Texas. Lexware purchased Pervasive's software product, Btrieve, in Germany from SOS, a third-party German software distributor. The DSLA, the license contract between Pervasive and Lexware, was an off-the-shelf, out-of-the-box contract that was accepted and activated by Lexware's purchase of Btrieve from SOS in Germany. There were no prior negotiations between Pervasive and Lexware and SOS was not an agent of either company.  Lexware allegedly later breached the DSLA in Germany when it refused Pervasive's demands that it terminate the DSLA and cease and desist its dominion and control over Btrieve in Germany. Likewise, Pervasive's claims against Lexware for unjust enrichment and quantum meruit arose in Germany from Lexware's refusal of Pervasive's demand that it cease and desist its dominion over the Btrieve software. Consequently, because none of Lexware's acts giving rise to Pervasive's claims occurred in or purposefully established contacts with Texas, the assertion of specific personal jurisdiction over Lexware for those claims in Texas would offend due process. Accordingly, the district court did not err in granting Lexware's Rule 12(b)(2) motion to dismiss the complaint against it for lack of specific personal jurisdiction over Lexware. This conclusion is clearly required by the controlling Supreme Court and circuit precedents discussed below.

## a. Neither Lexware's purchase and use of Btrieve nor its entry into the DSLA established purposeful contacts with Texas.

"The unilateral activity of [a plaintiff] who claim[s] some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. . . . [I]t is essential in each case that there be some act by which the

No. 11-50097

defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson*, 357 U.S. at 253. "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Burger King*, 471 U.S. at 475 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984); *World-Wide Volkswagen*, 444 U.S. at 299; and *Helicopteros*, 466 U.S. at 417). Thus, Pervasive's unilateral acts cannot satisfy the requirement of contact with the forum state and availment of its laws by Lexware.

Moreover, it is now well settled that "an individual's contract with an out-of-state party *alone* [cannot] automatically establish sufficient minimum contacts in the other party's home forum." *Burger King*, 471 U.S. at 478. "The Court long ago rejected the notion that personal jurisdiction might turn on 'mechanical' tests, or on 'conceptualistic . . . theories of the place of contracting or of performance.' Instead, we have emphasized the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' It is these factors— prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* at 478-79 (alteration in original) (quoting *Int'l Shoe*, 326 U.S. at 319; and *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316, 316-17 (1943)).

13

No. 11-50097

Applying these principles, Lexware, by becoming a party to the DSLA in Germany, did not make minimum contacts with Texas or purposefully avail itself of the protections and benefits of that state's laws. There were no prior negotiations between Lexware and Pervasive concerning that contract. The DSLA was an off-the-shelf, out-of-the-box contract that came with Btrieve, which Lexware purchased in Germany from a German software distributor. Nothing in the DSLA or the manner of purchase suggested that either party envisioned a long-term interactive business relationship involving Lexware's purposeful future contacts with Texas. Thus, the DSLA was not "an intermediate step serving to tie up prior business negotiations" by the parties in Texas or a contract calling for Lexware's future purposeful contacts with Pervasive in the forum state. *Id.* at 479 (citing *Hoopeston Canning Co.*, 318 U.S. at 317).

Although the DSLA did contain a Texas choice-of-law clause, that clause alone is not dispositive of the issue of specific personal jurisdiction. *Burger King*, 471 U.S. at 481-82; *Interfirst Bank Clifton v. Fernandez*, 844 F.2d 279, 284 n.4 (5th Cir. 1988). When combined with other factors, a choice-of-law clause may reinforce a conclusion that a defendant "deliberate[ly] affiliat[ed] with the forum State and [had] reasonable foreseeability of possible litigation there." *Burger King*, 471 U.S. at 482. However, the presence of a choice-of-law clause is not sufficient in itself to establish personal jurisdiction when, as here, the contacts do not otherwise demonstrate that the defendant "purposefully availed himself of the privilege of conducting business in Texas." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985).[4]

---

[4] Pervasive cites to two Texas court cases, *Michiana Easy Livin' Country Inc. v. Holten*, 168 S.W.3d 777 (Tex. 2005), and *Barnhill v. Automated Shrimp Corp.*, 222 S.W.3d 756 (Tex. App.–Waco 2007, no pet.), to support its argument that the choice-of-law provision was

14

No. 11-50097

Thus, Lexware's acts solely within Germany that gave rise to its contractual relationship with Pervasive under the DSLA differentiate this case from *Burger King*, 471 U.S. 462, in which the Michigan defendant, Rudzewicz, "deliberately 'reach[ed] out beyond' Michigan" to negotiate and enter into a "carefully structured 20-year" franchise contract with the Florida-based franchisor, Burger King, "that envisioned continuing and wide-reaching contacts with Burger King in Florida." *Id.* at 479-80 (alteration in original) (citation omitted). Rudzewicz's business partner attended prescribed management courses in Florida, Rudzewicz purchased restaurant equipment from a Florida-based division of Burger King, and the restaurant was regulated by policy set by Burger King's Florida-based headquarters. *Id.* at 466. In contrast, the DSLA involved no prior negotiations between Lexware and Pervasive and did not envision "continuing and wide-reaching contacts" between them in Texas. *Id.* at 480. Lexware made no contact with Texas when it purchased the software

---

evidence that Pervasive "ought to be subject to suit in any jurisdiction where it 'enjoys the benefits and protection of the laws of that state.'" *Michiana*, 168 S.W.3d at 787 (footnote omitted). Neither case supports this theory. *Michiana* does not stand for the proposition, as asserted by Pervasive, that a contracting party always "'enjoys the benefits and protection of the laws of [the forum] state,'" *Id.* (footnote omitted), when it agrees to a choice-of-law clause. Though the choice-of-law and choice-of-forum clauses at issue in *Michiana* stipulated that suits would be governed by Indiana law, the court did not rely on the clauses to reject Holten's assertion of specific jurisdiction, and instead focused on the contacts that Michiana had with Texas. In *Michiana*, the court declined to find specific jurisdiction where the buyer, a resident of Texas, purchased a recreation vehicle from a store that only did business in Indiana–which is comparable to the present case, in which a Texas resident sold a product to Lexware, a software company doing business in Germany and not in Texas. *Barnhill* correctly stated that a choice-of-law clause "'standing alone would be insufficient to confer jurisdiction'" and considered the clause only as "a factor" in its determination of specific jurisdiction. 222 S.W.3d at 764 (citation omitted). In *Barnhill*, the court affirmed that the trial court had specific jurisdiction over the case not because of the choice-of-law clause, but because the disputed contract contemplated a long-term relationship with Texas that the DSLA, in the present case, did not contemplate.

15

No. 11-50097

program in Germany and thereby entered into the related licensing agreement, the DSLA, with Pervasive in Germany. The DSLA required only that the purchaser return the object code and source code to Pervasive's office in Texas upon the contract's termination; and purchasers were asked to fill out and return two exhibits attached to the DSLA to Pervasive's office in Texas. It envisioned no additional contact between the purchasing party and Pervasive or its home state of Texas. Lexware's subsequent communication about Btrieve was limited to a request for the Btrieve Ultimate Patch, which Pervasive never supplied.[5] None of Lexware's actions in that connection demonstrates that it purposefully "reach[ed] out" to Pervasive in Texas so as to subject it to Texas courts' jurisdiction. *Burger King*, 471 U.S. at 473 (alteration in original) ("[P]arties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to the regulations and sanctions in the other State for the consequences of their activities." (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647 (1950))).

Instead, the record demonstrates that in respect to Lexware's purchase of the Btrieve software, and entry into the DSLA with Pervasive, Pervasive reached beyond Texas and into Germany, Lexware's principal place of business, not vice versa. In its complaint, Pervasive described itself as "a global leader in embeddable data management and data integration software." It went on to boast that: "For more than two decades, Pervasive Software's products have delivered value to tens of thousands of customers in more than 150 countries,

---

[5] Indeed, the DSLA specifically stated that Pervasive was not responsible for providing any technical assistance or upgrades to purchasers of Btrieve, which further suggests that Pervasive itself did not intend the DSLA to create any long-term contacts between Pervasive and the purchaser.

and international sales and operations currently account for a substantial part of Pervasive Software's business." It states that it has "servic[ed] virtually every industry and market around the world." Pervasive sold its software to a German third-party distributor for sale in Germany. It employed representatives who lived in Germany, used German e-mail addresses, and conversed with Lexware largely in German. Thus, in respect to Lexware's purchase of the Btrieve software and its entry into the DSLA contract with Pervasive in Germany, it was Pervasive, rather than Lexware, that reached out of its own state in order to purposefully sell its product and create a contractual relationship with Lexware in Germany.

**b. Pervasive's attempt to link the EMPA and its Addendum 1 with the DSLA is futile because neither contract provides such a link or a purposeful contact by Lexware to the forum state.**

Pervasive argues that Addendum 1 to the EMPA, in linkage with the DSLA, established purposeful contacts by Lexware with Texas. We disagree. We have just explained why Lexware's entering into the DSLA did not involve any purposeful contact by it with Texas. For similar reasons, the EMPA and its Addendum 1 did not involve any purposeful contact by Lexware with Texas either. Pervasive's argument that the parties agreed to link the EMPA's Addendum 1 with the DSLA is without merit.

In 1999 and 2000, the parties negotiated and executed the EMPA and its Addendum 1 in Germany. In the EMPA, Pervasive licensed Lexware to use certain Pervasive software products, *viz.*, Pervasive SQL Client/Server engine for Windows NT Netware and Linux (Suse, Red Hat and Caldera); Pervasive SQL 2000 Workgroup; and Pervasive SQL 2000 Workstation. The EMPA and its

No. 11-50097

Addendum 1 deal only with Pervasive's SQL 2000 products; they do not affect or alter the DSLA by which Lexware was licensed to use Pervasive's Btrieve software product in 1994. The DSLA and the EMPA (with its Addendum 1) are two separate contracts which license Lexware to use two different lines of Pervasive products, Btrieve and Pervasive's SQL 2000 products, respectively.

Pervasive argues that "[b]y its own language, Addendum 1 to the EMPA (the 'Btrieve Addendum') licensed 7,500 *Btrieve* 'enabling' seats to Lexware for US $125,250." But this is simply not so. Addendum 1 to the EMPA clearly licensed Lexware to use 7,500 "user seats of the Software authorized for distribution by [Lexware] as specified in Attachment 1 paragraph 1.1 of the European Manufacturing Partner Agreement." That Attachment 1 paragraph 1.1 of the EMPA provides: "1. Software Authorized for Distribution by [Lexware]: 1.1 Pervasive SQL 2000 Client/Server engine for Windows NT; Netware and Linux (Suse, Red Hat and Caldera)[.]" Thus, Addendum 1 to the EMPA licensed Lexware to use only the Pervasive SQL products and not the Btrieve Client Engine Version 6.15, which we have referred to in shorthand in this opinion as "Btrieve." Consequently, Addendum 1 to the EMPA did not link the DSLA with the EMPA or link the Btrieve and the Pervasive SQL software products, as Pervasive contends.

Pervasive's argument appears to be based on the appearance of the term "Btrieve" in a single instance in Addendum 1 of the EMPA in which it provides:

> 1. Btrieve Enabling Technology Program ("Enabling")
>
> "Enabling" means the utilization of a Btrieve connection for internal (internal to the application) use by application software developed, marketed and installed by Lexware. This prerequisit [sic] is linked to the fact that all Lexware application software independent of the

18

database management system used, requires "Enabling" in order to function properly.

Pervasive, as the drafter of the contract, presumably could have explained exactly what this provision means, but it did not undertake to do so. Instead, Pervasive assumes, without explaining how, that the Addendum 1 to the EMPA somehow links the EMPA with the DSLA and thereby makes both contracts applicable to the otherwise separate and distinct software products dealt with by each contract, *viz.*, "Btrieve Client Engine Version 6.15" and "Pervasive SQL Client/Server engine for Windows NT; Netware and Linux (Suse, Red Hat and Caldera)," respectively. In the absence of further alleged facts or explanation by Pervasive, we do not think the EMPA and its Addendum 1 can reasonably be read to merge them with the DSLA or to confuse the software products dealt with separately by each contract. Furthermore, even if the DSLA and the EMPA were to be linked as Pervasive supposes, this would not come any closer to conferring specific jurisdiction upon the Texas forum over Lexware in this case. The EMPA and its Addendum 1, like the DSLA, did not involve any purposeful contact with Texas by Lexware. Thus, the two contracts, together or apart, fail to establish specific jurisdiction over Lexware in Texas.

### c. Lexware's internet website sales did not establish personal jurisdiction over Lexware in Texas

Pervasive adduced evidence that twelve persons or businesses in Texas bought fifteen software programs from Lexware over the internet during a four-year period. Consequently, Pervasive argues, Lexware made sufficient minimum contacts to subject it to specific personal jurisdiction in Texas. Considering, however, that these internet sales averaged only about $66 each, that none of

No. 11-50097

them resulted in actionable harm to anyone in Texas, that only nine of the fifteen products were derived from Btrieve, and that none of Pervasive's causes of action arose or resulted from those internet sales, this jurisdictional argument is meritless.[6]

The Supreme Court has recognized that the internet is "'a unique and wholly new medium of worldwide human communication.'" *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 850 (1997) (footnote omitted). As such, it "raises significant questions about the application of traditional personal jurisdiction doctrine." 4A Charles Alan Wright et al., Fed. Prac. & Proc. § 1073.1, at 322 (3d ed. 2002) [hereinafter Wright et al]. "Although the Internet and the other new communications technologies do present some strikingly new factual patterns and do change the way personal jurisdiction is acquired over some defendants at the margins," *id.* at 322, "the analysis applicable to a case involving jurisdiction based on the Internet . . . should not be different at its most basic level from any other personal jurisdiction case. If the defendant is not physically present in or a resident of the forum state, and has not been physically served in the forum state, the federal court must undertake the traditional personal jurisdiction analysis." *Id.* at 327.[7]

---

[6] Pervasive also argues that the mere availability of some Lexware products on third-party websites accessible from Texas is a relevant contact by Lexware with Texas. Pervasive produced no allegations or evidence that any Texas resident actually purchased a Lexware product from a third-party website, or that Lexware intended its products to be purchased by persons or entities in Texas. Therefore, this argument is without merit.

[7] In *International Shoe*, the Court warned that "[i]t is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative." *Int'l Shoe*, 326 U.S. at 319. Although interactivity along the *Zippo* sliding scale can be an important factor in an internet-based personal jurisdiction analysis because it can provide evidence of

20

No. 11-50097

"The exercise of specific personal jurisdiction based on the defendant's contacts with the forum through the Internet requires that the plaintiff satisfy the terms of the appropriate jurisdictional statute, and then show that the exercise of jurisdiction will not violate the Constitution." *Id.* at 332. "This due process analysis has been refined . . . into a three-part test that seems fully applicable to jurisdiction questions generated by the new technologies: (1) Did the plaintiff's cause of action arise out of or result from the defendant's forum-related contacts? (2) Did the defendant purposely direct its activities toward the forum state or purposely avail itself of the privilege of conducting activities therein? (3) Would the exercise of personal jurisdiction over the defendant be reasonable and fair?" *Id.* at 334 (citing *Mink*, 190 F.3d at 336; *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000); *Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000); *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 416 (9th Cir. 1997); *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996)). If the plaintiff's allegations or evidence of defendant's internet activities can satisfy each prong of this test, the exercise of specific jurisdiction by a federal court generally should be upheld. *Id.* Here, Pervasive has failed to satisfy either of the first two prongs of the three-part test, and we therefore need not consider the third prong.

---

purposeful conduct, *see Mink*, 190 F.3d at 336 (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 119, 124 (W.D. Pa. 1997)), internet-based jurisdictional claims must continue to be evaluated on a case-by-case basis, focusing on the nature and quality of online and offline contacts to demonstrate the requisite purposeful conduct that establishes personal jurisdiction.

Pervasive fails the first part of the three-part test because the causes of action it asserts, based on Lexware's alleged breach of the DSLA in Germany and Lexware's alleged dominion and control of Btrieve in Germany, did not arise out of or result from the relatively sparse contacts involving Lexware's fifteen internet website sales of its products to twelve Texas billing addresses. *See Revell v. Lidov*, 317 F.3d 467, 472 (5th Cir. 2002) ("For specific jurisdiction we look only to the contact out of which the cause of action arises . . . .").

Moreover, Pervasive also fails the second part of the three-part test because Lexware's actions of making its German tax and financial software internet-accessible were not purposely directed toward Texas or purposely availing of the privilege of conducting activities in Texas. In *Hanson*, the Court said that jurisdiction cannot exist unless "there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." 357 U.S. at 253; *see also Wilson v. Belin*, 20 F.3d 644, 647-49 (5th Cir. 1994). "Thus it is not enough that the defendant has contacts with the forum; a separate requirement in the court's jurisdictional analysis is that those contacts must have been *purposefully established* by the defendant." Casad & Richman, *supra*, § 2-5, at 148-49. "In many cases where specific jurisdiction is unconstitutional, it is not because the defendant's contacts with the forum are 'insufficient;' after all one may be enough. Often the difficulty is not the lack of contacts but rather that such contacts that exist do not count because they have not been established purposefully by the defendant." *Id.* § 2-5, at 149-50. That is the case here; none of the contacts relied upon by Pervasive to invoke specific

No. 11-50097

jurisdiction over Lexware in the Texas forum count because none of them were established purposefully by Lexware.

"The objective of the purposeful availment requirement is to provide predictability and give notice to the defendant that it is subject to suit in the forum state, so that the company 'can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State.'" *Hy Cite Corp. v. Badbusinessbureau.com, LLC*, 297 F. Supp. 2d 1154, 1163 (W.D. Wis. 2004) (quoting *World-Wide Volkswagen*, 444 U.S. at 297). The purposeful availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King*, 471 U.S. at 475 (citations omitted). "Website interactivity is important only insofar as it reflects commercial activity, and then only insofar as that commercial activity demonstrates purposeful targeting of residents of the forum state or purposeful availment of the benefits or privileges of the forum state.*" Shamsuddin v. Vitamin Research Prods.*, 346 F. Supp. 2d 804, 813 (D. Md. 2004). A corporation's sales to forum residents must be more than "'isolated'" occurrences for the assertion of jurisdiction to satisfy the requirements of due process. *Burger King*, 471 U.S. at 475 n.18 (citation omitted).

Applying these principles, we conclude that Pervasive failed to show that Lexware had purposeful minimum contacts with Texas such that it should have reasonably anticipated being haled into court there. Lexware has no offices or sales agents in Texas and solicits no business there through advertising targeted specifically to Texas. Lexware's only contact with Texas is a commercial, interactive website which is accessible globally but available only in the German

23

language. This only coincidentally, and not purposely or deliberately, includes contact with a relatively few German taxpayers who happen to access it from Texas. Because Lexware's website and products were not available in English and have little utility for Texas or U.S. taxpayers, Lexware's contacts with Texas via its website cannot be interpreted as purposeful attempts to develop a market for Lexware's German tax return preparation programs in Texas or to avail itself of the protections of that state's laws. "[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen*, 444 U.S. at 297.

In essence, Lexware's actions toward Texas and its affiliation with that state were not so deliberate and substantial that Lexware should have reasonably anticipated being haled into court in Texas.

### 3. Lack Of Specific Jurisdiction—Conversion

The Texas long-arm statute states that a nonresident is considered to be doing business in the state—and therefore is subject to personal jurisdiction—if it "commits a tort in whole or in part in [Texas]." Tex. Civ. Prac. & Rem. Code § 17.042; *see also McFadin*, 587 F.3d at 761 (quoting *Guidry v. United States Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999)).[8] The tort of conversion is defined as "'the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights.'" *Bandy v. First State Bank, Overton, Tex.*, 835 S.W.2d 609, 622 (Tex. 1992) (quoting *Tripp Village Joint Venture v.*

---

[8] "The plaintiff bears the initial burden of pleading allegations sufficient to bring a nonresident defendant within the provisions of the long-arm statute." *American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 807 (Tex. 2002).

No. 11-50097

*MBank Lincoln Centre, N.A.*, 774 S.W.2d 746, 750 (Tex.App.—Dallas 1989, writ denied)). After reviewing the pleadings and the evidence presented, we agree with the district court that Pervasive has failed to make a prima facie showing that Lexware committed a conversion of Pervasive's property "in whole or in part" in Texas. Accordingly, Pervasive cannot subject Lexware to specific personal jurisdiction in Texas under the Texas long-arm statute on grounds of the tort of conversion.

It is undisputed that Lexware lawfully received dominion, control, and license to use the Btrieve software under the DSLA when Lexware purchased the Btrieve software package from SOS in Germany in 1994. There is no allegation or evidence that Lexware acted to exercise dominion and control over the Btrieve software by refusing to return it to Pervasive in any country other than Germany. In its complaint, Pervasive alleges that Lexware committed the tort of conversion by "wrongfully exercising dominion or control over the Btrieve Software in a manner inconsistent with Pervasive Software's rights." In effect, Pervasive alleges that Lexware's license to use and control Btrieve ceased when Pervasive notified Lexware that it was terminating the DSLA and demanded that Lexware cease and desist dominion and control over Btrieve. However, that conversion, if it occurred as alleged by Pervasive, was committed in Germany, not Texas. Pervasive argues that Lexware, which has offices only in Germany, retained a copy of the Btrieve software after Pervasive attempted to terminate the DSLA, and therefore converted that copy of the software. The Btrieve software therefore was converted, if at all, in Germany, not in Texas. Because the tort was not committed, in whole or in part, in Texas, it does not fall under Texas's long-arm statute. *See* Tex. Civ. Prac. & Rem. § 17.042; *Tuscano v.*

25

No. 11-50097

*Osterberg*, 82 S.W.3d 457, 470 (Tex.App.—El Paso 2002) (concluding that the Texas court could not exercise personal jurisdiction over the plaintiff's conversion claim because the plaintiff provided no proof that the defendants converted any property or materials in Texas), *abrogated on other grounds by BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002); *Central Tex. Cattle Co. v. McGinness*, 842 S.W.2d 388, 391 (Tex.App.—San Antonio 1992) (concluding that the Texas court could not exercise personal jurisdiction over the plaintiff's alleged conversion of cattle because all the defendant's actions with regard to the cattle occurred outside of Texas); *cf. Goodyear Dunlop,* 131 S. Ct. at 2851 ("Because the episode-in-suit . . . occurred in France, and the tire alleged to have caused the accident was manufactured and sold abroad, North Carolina courts lacked specific jurisdiction to adjudicate the controversy."). The mere fact that the converted item originated in Texas is not sufficient to create personal jurisdiction under the long-arm statute; the item must be in Texas when the conversion actually occurs. *See Laykin v. McFall*, 830 S.W.2d 266, 269-70 (Tex.App.—Amarillo 1992, orig. proceeding) (holding that there is no personal jurisdiction over a conversion claim where a ring, sent voluntarily out of Texas to a broker in California, was not converted until the broker refused to return it and therefore converted it in California, not Texas). Because the alleged conversion by Lexware occurred, if at all, in Germany, when Lexware refused to return its copy of Btrieve to Pervasive, the Texas district court lacked specific personal jurisdiction over the conversion claim.

In its complaint, Pervasive alleged only that Lexware converted the Btrieve software. In response to Lexware's Rule 12(b)(6) motion, Pervasive also argued that Lexware converted a master CD and key generator by retaining

26

No. 11-50097

them after Pervasive attempted to terminate the DSLA. However, these alleged conversions also occurred in Germany and therefore the Texas long-arm statute is not applicable. Therefore, because Pervasive has not pleaded or argued that Lexware committed the alleged conversions in whole or in part in Texas, Pervasive did not make a prima facie showing that Lexware can be haled into Texas courts under the Texas long-arm statute.

### 4. General Personal Jurisdiction

Pervasive also failed to make a prima facie case of general personal jurisdiction. "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop*, 131 S. Ct. at 2851 (quoting *Int'l Shoe*, 326 U.S. at 317). In *International Shoe*, the Supreme Court explained that "continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity . . . the continuous corporate operations within a state [must be] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe*, 326 U.S. at 318; *see also Goodyear Dunlop*, 131 S. Ct. at 2856. Lexware had only sporadic and attenuated contacts with the state of Texas, largely through its intermittent communications with Pervasive and fifteen internet website sales, over a four-year period, to twelve German taxpayer consumers with billing addresses in Texas, totaling approximately 650 Euros (approximately $915). Only nine of these sales—totaling approximately 330 Euros (approximately $465)—contained Btrieve-derived software. These contacts

No. 11-50097

were neither continuous nor systematic and do not satisfy the standard set out by the Supreme Court for establishing general personal jurisdiction over Lexware.

The Supreme Court has held that a court may exercise general personal jurisdiction over a company in only one case that postdated *International Shoe.* In *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952), the Supreme Court found there to be general personal jurisdiction because the defendant, a Philippine mining corporation, had ceased activity in the Phillippines during World War II, conducted all its business in Ohio, and the company president maintained an office in Ohio in which all company files were kept and from which all company activities were supervised. Because Ohio had become the corporation's principal place of business, Ohio was authorized to exercise general personal jurisdiction over the company. *Id.* at 447-48; *see also Goodyear Dunlop*, 131 S. Ct. at 2856. In a subsequent case, the Court held that a Columbian corporation did not have "the kind of continuous and systematic general business contacts the Court found to exist in *Perkins.*" *Helicopteros Nacionales*, 466 U.S. at 416. In *Helicopteros*, the nonresident defendant, a Columbian corporation, sent its chief executive officer to Texas for a contract-negotiation session; accepted checks drawn on a Texas bank; purchased helicopters, equipment, and training services from a Texas-based company for substantial sums of money; and sent personnel to a Texas-based company's facilities in Texas for training. *Id.* at 409, 416. Helicopter Nacionales' contacts with Texas far exceeded Lexware's contacts with the state in the present case, and still the Supreme Court held that they did not "constitute the kind of continuous and systematic general business contacts . . . found to exist in *Perkins*," and were insufficient to

No. 11-50097

support the exercise of jurisdiction over a claim that neither "ar[o]se out of . . . no[r] related to" the defendant's activities in Texas. *Id.* at 415–416 (internal quotation marks omitted). The Court in *Helicopteros* concluded that "mere purchases [made in the forum State], even if occurring at regular intervals, are not enough to warrant a State's assertion of [general] jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Id.* at 418. In the same vein, the Court in *Goodyear Dunlop* concluded: "[w]e see no reason to differentiate from the ties to Texas held insufficient in *Helicopteros*, the sales of petitioners' tires sporadically made in North Carolina through intermediaries." 131 S. Ct. at 2856.

Measured against *Goodyear Dunlop, Helicopteros,* and *Perkins*, it is clear that Lexware has not had continuous and systematic contacts in Texas such that it would be permissible to subject Lexware to general personal jurisdiction in the forum state of Texas. Unlike the defendant in *Perkins*, whose sole wartime business activity was conducted in Ohio, Lexware is in no sense at home in Texas. Lexware's attenuated connections to the state fall far short of the "'the continuous and systematic general business contacts'" necessary to make Lexware "at home" in the forum. These connections therefore do not empower Texas to entertain suit against Lexware on claims unrelated to anything that connects Lexware to the state. *Goodyear Dunlop*, 131 S. Ct. at 2857 (quoting *Helicopteros*, 466 U.S. at 416).

## C.

In its January 4, 2011 order, the district court granted Lexware's Rule 12(b)(2) motion and dismissed the case without prejudice. It therefore did not reach Lexware's 12(b)(6) motion. Pervasive argues that the district court should

have addressed Pervasive's conversion claim only in the 12(b)(6) motion and that it erred by conflating merits issues raised in the 12(b)(6) motion with its analysis of the 12(b)(2) motion. The district court did not err in first addressing the 12(b)(2) motion to dismiss for lack of personal jurisdiction over Lexware or in granting that motion. "Personal jurisdiction, [like subject matter jurisdiction], is 'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'" *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (second alteration in original) (quoting *Emp'rs Reinsurance Corp. v. Bryant*, 299 U.S. 374, 382 (1937)). "The requirement that jurisdiction be established as a threshold matter . . . is inflexible and without exception," *id.* at 577 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (internal quotation marks omitted), because "[j]urisdiction is power to declare the law, and [w]ithout jurisdiction the court cannot proceed at all in any cause." *Id.* (quoting *Steel Co.*, 523 U.S. at 94) (internal quotation marks omitted). Thus, subject matter jurisdiction and personal jurisdiction claims are "threshold grounds for denying audience to a case on the merits," and require that the courts reach the threshold claims before reaching claims on the merits. *Id.* at 584-85. Accordingly, we see no error in the district court's decision to dispose of the personal jurisdiction issue first and in not proceeding further after concluding that it lacked personal jurisdiction over Lexware.

## D.

Finally, Pervasive argues that the district court should have granted its requests for leave to amend the complaint. "Whether leave to amend should be granted is entrusted to the sound discretion of the district court, and that court's ruling is reversible only for an abuse of discretion." *Wimm v. Jack Eckerd Corp.*,

No. 11-50097

3 F.3d 137, 139 (5th Cir. 1993). Where, as in the present case, the district court provides no explanation for denying leave to amend, we affirm only where "the reason for the denial is 'readily apparent' . . . [and] the record reflects 'ample and obvious grounds for denying leave to amend.'" *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 426 (5th Cir. 2004) (footnotes omitted). In this case, the futility of amendment was readily apparent, and the record provided ample and obvious grounds for denying the motion based on futility. *See Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 556 (5th Cir. 2007). Pervasive made only a general request for leave to amend and did not identify how amendment would confer personal jurisdiction over Lexware. Pervasive did not identify any additional cause of action it might plead or explain how it might survive a personal jurisdiction challenge. None of the facts adverted to by Pervasive in any way suggests that it may have a cause of action against Lexware arising out of or related to Lexware's contacts with the forum state. Therefore, we find no error in the district court's decision to deny Pervasive's motion to amend its complaint.

## III. CONCLUSION

For these reasons, the judgment of the district court is AFFIRMED.