# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-20231

SPECIAL INDUSTRIES, INCORPORATED,

United States Court of Appeals
Fifth Circuit

**FILED**

August 5, 2014

Lyle W. Cayce
Clerk

Plaintiff - Appellant

v.

ZAMIL GROUP HOLDING COMPANY; VALLOUREC & MANNESMANN TUBES; SAUDI SEAMLESS PIPES FACTORY COMPANY LIMITED,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:11-CV-3207

Before SMITH, ELROD, and SOUTHWICK, Circuit Judges.

PER CURIAM:*

Special Industries, Inc. appeals the district court's dismissal of its claims against three foreign entities on the basis that the court lacked personal jurisdiction over any of the defendant companies. We AFFIRM.

## FACTUAL & PROCEDURAL BACKGROUND

This appeal arises from a business dispute between the plaintiff, Special Industries, Inc. ("SII"), a Delaware corporation doing business in Texas, and

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-20231

three foreign defendants: (1) Zamil Group Holding Company, a Saudi Arabian company; (2) Saudi Pipes, a Saudi Arabian company formed by Zamil; and (3) Vallourec & Mannesmann Tubes ("V&M Tubes"), a French company.  SII is a specialist in the manufacture, supply, and distribution of tubular goods for use in the oil and gas, refining, petrochemical, and construction industries.  The subject of the dispute was a plan for development of a pipe heat-treating and threading plant ("OCTG plant") in Saudi Arabia.[1]

SII was founded in 1963 in New York by Charles Tarazi.  Tarazi acted as president of SII, as well as acting representative of SII's joint venture with Zamil, which forms the basis of this dispute.  SII opened a Houston office in 1970.  It became SII's headquarters in 1987.  SII now maintains the Houston office as its only United States office, with its other principal office in London.  SII's principal officers, Charles Tarazi and Michael Rafferty, work primarily from their homes in New York, London, and New Jersey.  In the early 1990's, SII recognized an opportunity to develop an OCTG plant in Saudi Arabia.  Seeking a Saudi partner for the project, SII contacted Zamil in 1994. Zamil is a closed joint stock company.

Zamil's participation in the OCTG plant project was made contingent on obtaining a loan from the Saudi Industrial Development fund.  When the fund denied Zamil's loan application, the project was shelved.  In 2002, SII visited Zamil's office in Saudi Arabia in an effort to revive the project.  Zamil and SII remained in communication and held several meetings in Europe in 2006.  The meetings resulted in a Memorandum of Understanding ("First MOU") between SII and Zamil dated October 17, 2006.  The First MOU outlined the parties'

---

[1] The "OCTG" acronym is derived from the term "oil country tubular goods," which are petroleum industry pipe and tube products, such as drill pipe and casings.

No. 13-20231

respective obligations for the project, the stated objective being to set up an OCTG facility in Saudi Arabia.

In 2008, construction of the OCTG plant began. Saudi Pipes was formed by Zamil as a corporate entity to operate the plant. On June 17, 2009, SII and Saudi Pipes executed a second Memorandum of Understanding ("Second MOU"). The Second MOU covers the period from its signing through June 2001 and outlined SII's continuing responsibilities for the project. SII contends it fully performed under the First and Second MOU, and that Zamil and Saudi Pipes have failed to pay for that performance.

V&M Tubes was also involved early in the Saudi Arabian OCTG plant project as a potential technical partner. Talks with V&M Tubes ended in 2005 without reaching an agreement. In 2008, because Zamil learned of rumors that V&M Tubes was planning on opening a competing Saudi Arabian plant, it asked SII to contact V&M Tubes. SII contends it facilitated discussions with V&M Tubes in 2009 and throughout the fall of 2010, arranging several meetings in Paris between Zamil, SII, and V&M Tubes. In 2010, meetings took place between only Zamil and V&M Tubes in which V&M Tubes proposed to acquire Saudi Pipes. The acquisition occurred in 2011, at a purchase price of $135 million.

SII contends that, concurrent with these events, Zamil represented that it was and would be the exclusive sales representative and manager for marketing, importing, and selling the end OCTG products from the Saudi Arabian OCTG plant in the United States, Canada, and Mexico. SII calls this the "representation agreement." SII argues Zamil and Saudi Pipes delayed in execution of a formal written representation agreement, but that SII continued performance in reliance on the promise that Zamil would execute the written agreement. SII arranged a trial order of finished OCTG products for interested buyers to test and inspect. SII alleges that when V&M Tubes purchased Saudi

3

No. 13-20231

Pipes, it also interfered with SII's trial order by instructing Zamil and Saudi Pipes to delay production and execution of the formal written representation agreement with SII.

In August 2011, SII filed the current suit in the United States District Court for the Southern District of Texas. In the operative complaint, SII claimed Zamil breached the First MOU and failed to honor the representation agreement. SII also stated a claim for breach of contract against Saudi Pipes for its alleged breach of the Second MOU. SII also claimed Zamil breached various oral and implied contracts relating to the OCTG project as well as claims for quantum meruit, unjust enrichment, promissory estoppel, and fraud. SII stated a claim against V&M Tubes for tortious interference with SII's representation agreement with Zamil and Saudi Pipes.

Zamil, Saudi Pipes, and V&M Tubes each filed motions to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). The district court dismissed the case in March 2013, concluding it lacked personal jurisdiction over any of the defendants. SII timely appealed.

DISCUSSION

We review a district court's dismissal for lack of personal jurisdiction *de novo*. *Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 380 (5th Cir. 2003). The plaintiff has the burden of making a *prima facie* showing of jurisdiction. *Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.*, 615 F.3d 364, 368 (5th Cir. 2010). A federal court sitting in diversity in Texas may exercise personal jurisdiction over a foreign defendant only if the Texas long-arm statute applies and the due process clause of the Fourteenth Amendment is satisfied. *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 220 (5th Cir. 2012). The Texas long-arm statute has been interpreted as coextensive with the federal due process standards. *Id.* Accordingly, the court

may consider only whether the assertion of personal jurisdiction is consistent with federal due process considerations. *Id.*

> There are two components to the due process inquiry:

> (1) the defendant purposefully must have established minimum contacts with the forum state, invoking the benefits and protections of that state's laws and, therefore, reasonably could anticipate being haled into court there; and (2) the exercise of personal jurisdiction, under the circumstances, must not offend traditional notions of fair play and substantial justice.

*Command-Aire Corp. v. Ontario Mech. Sales and Servs. Inc.*, 963 F.2d 90, 94 (5th Cir. 1992). If a defendant has deliberately engaged in significant activity in a state or created continuing obligations between itself and residents of the state, it has availed itself of the privilege of conducting business there; in such a circumstance, it is not unreasonable to require it to submit to the burdens of litigation in that forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985). The requirement that a defendant's business activity be deliberate prevents jurisdiction from arising from mere "random, fortuitous, or attenuated contacts, or [from] the unilateral activity of another party or a third person." *Id.* at 475 (quotation marks and citations omitted). The burden of litigating in this country imposed on parties residing in foreign countries justifies a conclusion that "the minimum contacts analysis is particularly important when the defendant is from a different country." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).

Once the plaintiff has established minimum contacts, factors determining whether the assertion of personal jurisdiction is appropriate include: the burden on the defendant; the "forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief"; "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several

No. 13-20231

[s]tates in furthering fundamental substantive social policies." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (citations omitted).

Jurisdiction may be general or specific. If a defendant's contacts with the forum state are continuous and systematic, the court may exercise general jurisdiction over an action against the defendant, regardless of whether the action is related to the defendant's contact with the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984). A court may exercise specific jurisdiction over a defendant in a suit arising out of or related to the defendant's contact with the forum. *Id.* at 414.

## I.    *Zamil and Saudi Pipes*

Zamil and Saudi Pipes filed individual Rule 12(b)(2) motions to dismiss. SII, however, responded to their motions jointly and contended they are essentially a single business enterprise for jurisdictional purposes. The district court adopted SII's treatment of Zamil and Saudi Pipes as one for its jurisdictional analysis without deciding the single business enterprise issue. The district court did so because the court determined the result of the jurisdictional analysis would be the same. The briefing and arguments by the parties to this court have continued to merge facts relevant to the jurisdictional analysis for both entities. We agree with the district court's determination that the result of the analysis does not depend on whether these two parties are considered together or separately. Accordingly, we will address personal jurisdiction over the two entities in conjunction, referring to them as the "Zamil defendants."

SII contends the Zamil defendants are subject to the court's specific jurisdiction because their liability relates to SII's work in Texas and the Zamil defendants' contacts with Texas in furtherance of and pursuant to the First MOU, Second MOU, and the representation agreement. Basically, SII argues

No. 13-20231

that Zamil cultivated a relationship with SII for the benefit of SII's connection to the OCTG industry in Texas, and that Zamil itself also developed extensive contacts with Texas through its long relationship with SII in furtherance of the joint venture for the development of the OCTG plant in Saudi Arabia.

SII urges the following contacts justify the exercise of specific jurisdiction over the Zamil defendants: (1) Zamil's correspondence with SII identified SII's location as Houston, which it calls the "heart" of the OCTG industry; (2) Zamil consented to SII acting on Zamil's behalf, presumably to utilize SII's contacts in the Texas OCTG business; (3) officers of Zamil and Saudi Pipes traveled to Texas on three occasions to study the OCTG industry, attend conferences, and meet with representatives of Texas-based companies in relation to the OCTG plant; (4) the First and Second MOU directed SII to engage in activity in the forum with Texas-based companies; and (5) Zamil itself appealed to experts in the OCTG industry in Texas, forming contracts or doing business with Texas companies like National Oilwell Varco, Hunting Energy Services, and others. SII argues the hub of its performance under the contract with the Zamil defendants occurred in Texas and that, having purposefully contracted with a company located in Texas, the Zamil defendants could reasonably have anticipated the potential for litigation in Texas.

In concluding it lacked jurisdiction over the Zamil defendants, the district court relied heavily on two cases: *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026 (5th Cir. 1983), and *Moncrief Oil International Inc. v. OAO Gazprom*, 481 F.3d 309 (5th Cir. 2007). In *Moncrief*, the foreign defendants negotiated with Moncrief to develop a Russian gas field. They executed several agreements for that purpose. 481 F.3d at 310-11. When Moncrief filed suit in Texas alleging breach of the parties' agreements, it alleged the following as the defendants' contacts with Texas: "(1) entering into contracts with Moncrief, (2) knowing from the outset that Moncrief is a Texas resident,

No. 13-20231

(3) acknowledging and approving of Moncrief's substantial performance in Texas, and (4) sending an executive to visit Texas . . . in furtherance of that performance." *Id.* at 312. We, though, pointed out that all relevant agreements were executed in Russia, concerned a Russian joint venture to develop a Russian gas field, and provided that they would be governed by Russian law. *Id.* We explained that contracting with a resident of Texas was not enough. Moncrief had engaged in unilateral activities in Texas while the defendants had not performed any of their obligations in Texas. *Id.* While the defendants may have predicted Moncrief would perform many of its duties in Texas, the contract did not require work in Texas and it was not "clearly the hub of the parties' activities." *Id.* Finally, we gave great weight to the fact that the contracts forming the basis of the parties' dispute contained choice of law provisions providing for Russian law. *Id.* at 313.

Much as in *Moncrief*, Zamil's single act of contracting with SII, while potentially based on knowledge that SII would perform many of its obligations in Texas, is not enough. The First MOU did require SII to engage in some activity in Texas by making SII responsible for negotiating a license to use the threading tools of a Texas-based company, Hunting. It was also foreseeable that the Zamil defendants, through SII, would appeal to other Texas-based experts in the OCTG industry to perform some work on the project. SII highlights the contacts it made with such Texas-based companies as National Oilwell Varco, U.S. Steel, Ellison Technologies, and Texas International Engineering Consultants for work on the OCTG project. Nevertheless, the only work required to be performed in Texas by the First and Second MOUs was the negotiation of a license agreement with Hunting. The contacts with other Texas-based companies were primarily the result of the unilateral activity of SII and not required by the terms of the parties' agreements.

8

No. 13-20231

Importantly, the contracts SII alleges form the basis of this court's specific jurisdiction were negotiated in Europe and executed in Saudi Arabia, they contained choice of law provisions providing for application of the laws of Saudi Arabia and England, concerned a joint venture to build an OCTG plant in Saudi Arabia, and payments under the contract were made to SII's bank accounts in New York and Switzerland. Saudi Arabia was the "hub" of the parties' activity, not Texas. The factors important to the *Moncrief* court weigh against SII's argument that the foreseeability of SII's performing its obligations in Texas is sufficient for specific jurisdiction over the Zamil defendants.

SII disputes the district court's reliance on *Moncrief*, arguing that the Zamil defendants not only understood that substantial performance under the contracts would occur in Texas but specifically entered into the relationship with SII to gain the benefit of SII's business connections in Texas. SII argues the assertion of jurisdiction on the basis of a single contract with a forum resident is proper when it is foreseeable that the effect of the contract would be to cause business activity in the forum.

The primary case cited by SII to support its jurisdictional argument is *Mississippi Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003 (5th Cir. 1982). There, the California defendant entered a sustained relationship with a Mississippi trucking company knowing that the company's only place of business was in that state, their trucks would be garaged and serviced at the Mississippi headquarters, and payment would be tendered to Mississippi. *Id.* at 1009-11. We concluded that the defendant by its single contract with the Mississippi resident had taken "purposeful and affirmative action, the effect of which [was] to cause business activity, foreseeable by [the defendant], in the forum state." *Id.* at 1007 (quotation marks omitted).

Quite differently, here the relevant contracts that must serve as the basis for jurisdiction are the First and Second MOUs entered by the Zamil

defendants with SII.  SII is not an entity existing only in Texas.  In carrying out its responsibilities under the MOUs, SII did not only operate out of Texas.  Work was performed from SII's London office and from the homes of the principal officers in New York, New Jersey, and London.  Moreover, while the First MOU directed SII to obtain a license to use the threading tools of a Texas-based company, the First and Second MOUs did not otherwise specifically call for any work to be performed by either party in Texas.  Unlike in *Transpo*, it cannot be said that the Zamil defendants took purposeful action in the context of their contract with SII to develop an OCTG plant in Saudi Arabia, the effect of which would be to cause business activity in Texas.

"[T]he determination of whether a foreign corporation should be required to defend itself in a suit in Texas . . . must be decided on its own facts."  *Sw. Offset, Inc. v. Hudco Pub. Co., Inc.*, 622 F.2d 149, 151 (5th Cir. 1980).  The facts identify where the contract was formed, where it would be performed, whether the plaintiff's business is conducted solely in the forum, the hub of the parties' activity, where payments under the contract were tendered, any choice of law provision in the contract, and the foreseeability that a material part of the obligations under the contract would be performed in the forum.  *See Moncrief*, 481 F.3d at 312-13 (collecting and discussing factors).  The foreseeability that SII would perform part of its obligations under the contract in Texas, and that the parties did in fact engage other Texas companies for work on the project, is not enough for a finding of specific jurisdiction over the Zamil defendants.  The contracts were formed outside of Texas, did not expressly provide for work to be done in Texas, the SII individuals performing work under the contract did not do so solely from Texas, Texas was not the hub of the parties' activities, the contracts' choice of law provisions did not provide for Texas law, and payments under the contract were not made to Texas.

SII also argued that Zamil engaged in business with Texas residents in matters unrelated to the OCTG project in Saudi Arabia. To the extent SII argues those contacts serve as the basis for this court's jurisdiction, they would have to be sufficient to create general jurisdiction inasmuch as the activities do not relate to the OCTG project. *See Helicopteros Nacionales de Colombia*, 466 U.S. at 414-15. SII has not alleged the Zamil defendants' contacts with the forum are sufficiently continuous and systematic for this court's assertion of general jurisdiction. *Id.* We conclude it was not error for the court to dismiss the Zamil defendants for lack of personal jurisdiction.

## II.    *V&M Tubes*

V&M Tubes is an entity incorporated in France with its registered office and principal place of business in that country. It is a holding company with no office, property, bank accounts, or employees in Texas. V&M's involvement in this suit arises out of its meetings with SII in Europe regarding V&M's cooperation in the OCTG plant in Saudi Arabia. Meetings between V&M Tubes and Zamil led to V&M's acquisition of Saudi Pipes. SII's complaint against V&M Tubes alleged a single cause of action for tortious interference based on the allegation that V&M Tubes interfered with SII's exclusive representation agreement with the Zamil defendants.

SII contends this court may assert general jurisdiction over V&M Tubes by virtue of the fact that V&M Tubes has subsidiaries in Texas that do business there. The argument is premised on an alter ego theory, that V&M Tubes is a single corporate entity holding itself out as a functional whole with its subsidiaries in Texas. *See BMC Software Belgium N.V.*, 83 S.W.3d at 799 (identifying that this circuit and some Texas courts have relied on the alter ego rule in determining personal jurisdiction).

No. 13-20231

"Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there . . . . [I]n some circumstances a close relationship between a parent and its subsidiary may justify a finding that the parent 'does business' in a jurisdiction through the local activities of its subsidiaries." *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983). The relationship between the subsidiary and parent must be such that they are in reality the same corporation. Typically, this requires the corporate separation to be a fiction. *Id.* at 1159-60 (citing *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 337 (1925)). On the other hand, "so long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other." *Id.* at 1160. "The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation." *BMC Software Belgium*, 83 S.W.3d at 798.

SII identifies eight entities, either wholly or majority-owned by V&M Tubes, that operate in Texas. It highlights representations V&M Tubes makes on its website and online promotional material regarding its global structure and integration as a "single corporate entity." Officers and directors of V&M Tubes sit on the boards of each of the subsidiaries. There is evidence from representations made on the websites of V&M Tubes' subsidiaries in Texas which identify V&M Tubes, link to V&M Tubes' website, or otherwise depict the global and unified nature of V&M's corporate structure. V&M Tubes is also party to service agreements with many of its subsidiaries under which it provides human resources management and services in finance, tax, investments, legal, and intellectual property. V&M Tubes is party to Patent and Trademark Services Agreements with its Texas subsidiary, VAM USA, and also party to license agreements with many of its subsidiaries for the right

to use the V&M trademark logo.  Finally, V&M Tubes is a party, as a lender, to a loan agreement with V&M Holdings and makes payments to V&M Holdings' account in Texas.

These facts support that V&M Tubes holds itself out to the public as a unified company doing business in Texas.  SII argues that is enough for general jurisdiction over V&M Tubes on an alter ego theory.  We conclude otherwise.

Factors guiding Texas courts in determining whether the parent and subsidiary should be considered joined for jurisdictional purposes include: (1) whether distinct adequately capitalized units are maintained; (2) whether daily operations are separate; (3) if formal barriers exist between management, each functioning in its own interest; (4) whether the entities file consolidated tax returns; (5) ownership of the subsidiary's stock by the parent; (6) whether the two share common officers and directors; (7) the extent to which books and accounts are kept separate; (8) whether officers and directors of one determine the policies of the other; (9) whether others are informed of their separate identity; and (10) whether they have separate meetings of shareholders and directors.  *Daimler-Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 720-21 (Tex. App. — Austin 2000, pet. dism'd w.o.j.).

SII has presented evidence only that V&M Tubes has substantial ownership in the stock of its subsidiaries, shares common officers and directors, and the public may be misled about the companies separate identities due to V&M's public representations.  Stock ownership and commonality of officers, alone, are insufficient to conclude a parent company is the alter ego of its subsidiaries.  *See Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 219 (5th Cir. 2000).  SII has not alleged the companies failed to maintain distinct, adequately capitalized units with separate books, accounts, tax filings, meetings, or other formal barriers.  SII's pleadings are devoid of allegations that V&M Tubes exercised a greater than normal degree of control

over the daily operations of its Texas subsidiaries. SII simply points to V&M's promotional literature boasting "complete control" and the existence of a "Vallourec Group" of companies, which does not indicate anything other than a standard corporate-family structure. We also note this court has concluded that formal contractual relationships in the form of service, patent, trademark, licensing, and interest-bearing loan agreements, like the ones V&M has here with its subsidiaries, could be more indicative of separateness than unity. *Id.*

One Texas court has explained that ownership of a locally operating subsidiary, while it may be considered "*in toto* with the defendant's other forum contacts[,] . . . may not be enough for minimum contacts outside the context of alter ego or similar conceptual devices." *Villagomez v. Rockwood Specialties, Inc.*, 210 S.W.3d 720, 732 (Tex. App. — Corpus Christi-Edinburg 2006, pet. denied). SII has alleged no Texas contacts other than V&M's ownership of subsidiaries and the representations we have detailed. The alter ego theory of jurisdiction, though, requires proof of a greater than normal degree of control over the daily operations of the subsidiaries. *Hargrave*, 710 F.2d at 1160. In one Texas decision, the court did rely in part on the fact that the foreign parent corporation held itself out as doing business through its subsidiary operating in the forum. *Daimler-Benz*, 21 S.W.3d at 723-24. The court also relied heavily on the extensive evidence indicating that Daimler-Benz exercised actual and significant control over the daily operation of its subsidiaries. *Id.*

We find no authority allowing for the assertion of general jurisdiction over a foreign parent corporation premised only on the foreign corporation's ownership of subsidiaries in the forum and representations by the foreign parent of its "unified" corporate structure. The assertion of jurisdiction must be premised either on sufficient minimum contacts of the foreign parent with the forum or on some evidence demonstrating the parent company's actual control over the internal business operations and affairs of the subsidiary.

No. 13-20231

The district court correctly concluded that personal jurisdiction was lacking.

AFFIRMED.