# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

─────────

No. 17-41268

─────────

United States Court of Appeals
Fifth Circuit

**FILED**
November 19, 2019

Lyle W. Cayce
Clerk

DIECE-LISA INDUSTRIES, INCORPORATED,

Plaintiff - Appellant

v.

DISNEY ENTERPRISES, INCORPORATED; DISNEY CONSUMER PRODUCTS, INCORPORATED,

Defendants - Appellees

------------------------------------------------

Consolidated with 17-41271

DIECE-LISA INDUSTRIES, INCORPORATED,

Plaintiff - Appellant

v.

DISNEY STORE USA, L.L.C.; DISNEY SHOPPING, INCORPORATED; BUENA VISTA HOME ENTERTAINMENT, INCORPORATED; WALT DISNEY STUDIOS MOTION PICTURES; BUENA VISTA THEATRICAL GROUP, LIMITED; DISNEY INTERACTIVE STUDIOS, INCORPORATED; DISNEY LICENSED PUBLISHING-DISNEY BOOK GROUP, L.L.C.; WALT DISNEY RECORDS; DISNEY DESTINATIONS, L.L.C.; WALT DISNEY PARKS ; RESORTS U.S., INCORPORATED; MAGICAL CRUISE COMPANY, LIMITED; MAGIC KINGDOM, INCORPORATED,

Defendants - Appellees

No. 17-41268
c/w No. 17-41271

Appeals from the United States District Court
for the Eastern District of Texas

Before STEWART, DENNIS, and WILLETT, Circuit Judges.

JAMES L. DENNIS, Circuit Judge.

Plaintiff Diece-Lisa Industries, Inc. (Diece-Lisa) filed two separate lawsuits against various Disney corporate entities alleging that those entities' use of the "Lots-O'-Huggin' Bear" (aka "Lotso") in the movie *Toy Story 3* and sales of merchandise depicting Lotso infringed on Diece-Lisa's "Lots of Hugs" trademark. The two cases were consolidated, and more than three years of litigation ensued. Diece-Lisa appeals three of the court's rulings in the consolidated case. We AFFIRM in part, VACATE in part, and REMAND with instructions.

**I.**

Diece-Lisa holds a trademark issued in 2008[1] for "Lots of Hugs" as a word mark for use in connection with "[t]oys, namely, puppets" and sells stuffed toy bear products branded with the mark. In 2010, Disney released *Toy Story 3*, an animated film featuring Disney heroes Sheriff Woody and Buzz Lightyear. In the film, Woody and Buzz battle Lotso,[2] a hot pink teddy bear with a big nose and a Southern accent. The film was a critical and commercial success, becoming the highest-grossing film of 2010. *Toy Story 3* gave rise to many consumer products, including toys depicting various characters from the

---

[1] Diece-Lisa held an earlier trademark for "Lots of Hugs," issued in 1997, but that trademark was canceled in 2004 by the United States Patent and Trademark Office.

[2] The character is referred to in the movie and in merchandise by both his full name, Lots-O'-Huggin' Bear, and his nickname, Lotso. For consistency and brevity, we will use his nickname throughout.

picture. The Lotso character has been sold as a stuffed toy and a plastic figurine, as well as incorporated into a variety of other consumer products.

Diece-Lisa brought suit in the United States District Court for the Eastern District of Texas, alleging that the sales of Lotso merchandise by various Disney entities infringed on Diece-Lisa's "Lots of Hugs" trademark.[3] There are two primary groups of Disney defendants relevant to this appeal: (1) the retail entities, consisting of Disney Store USA, LLC (DSU) and Disney Shopping, Inc. (DSI); and (2) the IP entities, consisting of Disney Enterprises, Inc. (DEI) and Disney Consumer Products, Inc. (DCP). The retail entities (DSU and DSI) sell merchandise modeled on characters from Disney and Pixar movies. DSU owns brick-and-mortar retail stores that sell the merchandise, while DSI sells similar merchandise online at disneystore.com. As for the IP entities, DEI owns intellectual property rights in Disney characters, and, along with DCP, grants licenses to third parties—including the retail entities—to manufacture and sell merchandise based on those characters.

Diece-Lisa first filed suit in 2012 against the retail entities, DSU and DSI, (docketed as case No. 2:12-CV-00400, referred to herein as the 400 case), alleging federal trademark infringement and unfair competition based on sales of toy bears and other merchandise marked with the Lotso name.[4] In 2014, Diece-Lisa filed a separate suit in the same court (docketed as case No. 2:14-CV-00070, referred to herein as the 70 case), this time against the IP entities, DEI and DCP, claiming trademark infringement based on the IP entities'

---

[3] In addition to trademark infringement, Diece-Lisa also alleged unfair competition under the Lanham Act.

[4] Diece-Lisa's 400 case was originally filed against DEI, Pixar, and The Walt Disney Company, asserting five trademark-based claims. Its first amended complaint retained the same causes of action from the original complaint but substituted the retail entities for the former defendants. Diece-Lisa's second amended complaint dropped all but the federal trademark infringement and unfair competition claims.

granting licenses to third parties who manufacture and sell Lotso merchandise. The IP entities moved to dismiss the 70 case for lack of personal jurisdiction and improper venue, arguing that their only activities relating to Texas—granting non-exclusive licenses to third-party licensees who chose to conduct business in Texas—were insufficient to confer personal jurisdiction over the IP entities.

The district court consolidated the 400 case and the 70 case. Soon after consolidation, the magistrate judge[5] granted Diece-Lisa leave to file a third amended complaint (3AC) that would serve as the complaint in both cases, overruling objections from Disney defendants (both the IP and retail entities). The 3AC increased the number of corporate subsidiary Disney defendants from four to fourteen and expanded the action from claims based on sales of merchandise marked with the allegedly infringing Lotso *name* to claims based on uses of the Lotso *character* in the *Toy Story 3* movie, video games, CDs, books, ice shows, and other live productions. The consolidated suit then had ten new Disney subsidiary defendants (the "New Parties") and several new infringement claims based on the use of a character, rather than on the alleged use of the "Lots of Hugs" mark. All the New Parties moved to dismiss, arguing that venue was improper and that Diece-Lisa failed to state a cause of action. Five of the New Parties moved to dismiss for lack of personal jurisdiction. As we explain further below, the court never ruled on these motions.

While these motions from the New Parties were pending, the court turned its focus to the IP entities, denying their pre-consolidation motion to dismiss the 70 case for lack of personal jurisdiction. Because the parties had yet to conduct jurisdictional discovery, the court reasoned, Diece-Lisa had to make only a prima facie showing of personal jurisdiction. While Diece-Lisa

---

[5] The case was referred to a magistrate judge "for all pretrial proceedings."

had not necessarily "proven personal jurisdiction by a preponderance of the evidence," the court found it met the prima facie standard. The IP entities filed a motion for reconsideration, again urging that they were not subject to personal jurisdiction because their only contact with Texas was their grant of non-exclusive licenses to third parties who conducted business in Texas.

Following the IP entities' motion for reconsideration, the district court and magistrate judge took a number of actions relevant to this appeal with respect to the various parties in the consolidated action, which we set out in the order they occurred.

First, nearly a year after granting Diece-Lisa leave to file the 3AC, the magistrate judge vacated that order sua sponte and without prior notice or a hearing, effectively removing the New Parties, and Diece-Lisa's claims against them, from the suit. This vacatur occurred while motions to dismiss based on personal jurisdiction and failure to state a claim were pending that, if granted, would have removed the New Parties from the suit. The magistrate judge said he had "improvidently granted" Diece-Lisa's motion for leave to file the 3AC, reasoning that the 3AC "resulted in needless complication and delay" and "changed the nature of the case." The magistrate judge found the claims alleged in the 3AC were less connected "to the original claims than the court originally perceived" and noted "serious issues of personal jurisdiction and venue" that arose under the 3AC. The effect of the district court's vacatur order was that Diece-Lisa's claims against the New Parties were eliminated, the New Parties were removed from the litigation, and the New Parties' pending motions to dismiss were moot. Diece-Lisa filed objections to the magistrate judge's order in the district court.

Second, the district court stayed the case on the parties' agreed motion. Specifically, while awaiting a ruling from the district court on Diece-Lisa's

5

objections to the magistrate judge's vacatur of the 3AC, Diece-Lisa and the defendants submitted, and the district court entered, an agreed order that closed fact discovery and prohibited further "assertion of additional claims, defenses, or theories of liability or damages." Despite this agreed order, Diece-Lisa filed a fourth amended complaint (4AC), which alleged new theories of contributory trademark infringement and vicarious liability and attempted to revive the character-based infringement claims eliminated by the vacatur of the 3AC. Diece-Lisa also issued deposition notices for fact witnesses and requests seeking production of a broad array of documents. The magistrate judge granted defendants' motion to strike the 4AC and quashed notice of the depositions, finding that Diece-Lisa violated the agreed order.

Third, the district court adopted the magistrate judge's order vacating the 3AC, overruling Diece-Lisa's objections.[6] Like the magistrate judge, the district court focused on how the 3AC changed the nature of the case from one alleging misuse of a *mark* to one alleging misuse of the Lotso *character*. Diece-Lisa raised concerns of prejudice "in light of the extensive discovery and completed expert reports related to the most recently added defendants," but the district court found these concerns "both minimal and outweighed by the considerations favoring denial of leave to amend." The district court explained that Diece-Lisa was free to use any discovery it obtained while the 3AC was pending "in a separate action" but also noted that "the statutes of limitations applicable to [Diece-Lisa's] claims may significantly and negatively impact its rights."

Fourth, and finally, the district court turned its attention back to the IP entities' motion for reconsideration of its personal jurisdiction order. The court

---

[6] The district court reviewed the magistrate judge's order de novo "because the order had the dispositive effect of dismissing multiple defendants from the case."

granted the motion and dismissed the IP entities for lack of personal jurisdiction, agreeing with the IP entities' argument that "a non-exclusive license agreement alone is insufficient to trigger personal jurisdiction over the licensor." Because the IP entities were the only defendants remaining in what was the 70 case before consolidation, the court dismissed the 70 case and deconsolidated the two cases. On Diece-Lisa's unopposed motion, the district court stayed the 400 case against the retail entities pending the resolution of this appeal.[7]

Diece-Lisa appeals two of the district court's rulings and one magistrate judge's ruling in the consolidated case: (1) the district court's final judgment in the 70 case dismissing the IP entities for lack of personal jurisdiction; (2) the district court's adoption of the magistrate judge's vacatur of his prior order allowing Diece-Lisa to file the 3AC; and (3) the magistrate judge's striking of Diece-Lisa's 4AC.

## II.

Before we evaluate the merits of Diece-Lisa's challenges to these rulings, we must first determine the ambit of our jurisdiction. Each constituent case must be analyzed individually on appeal to ascertain jurisdiction and to decide its disposition. *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018). We have jurisdiction over "appeals from all final decisions of the district courts," except those directly appealable to the Supreme Court. 28 U.S.C. § 1291. A final judgment is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Ray Haluch Gravel Co. v. Cent. Pension Fund*, 571 U.S. 177, 183 (2014). Consolidation complicates this finality inquiry, as

---

[7] Due to the district court's striking the 4AC and vacatur and resulting disallowance of the 3AC, the live complaint in that 400 case has reverted to the pre-consolidation Second Amended Complaint against the retail entities.

the district court may issue a final judgment in one constituent case while another constituent case or cases remain pending, as occurred here. The Supreme Court recently addressed the reviewability of final judgments issued in consolidated cases, holding unanimously that "when one of several consolidated cases is finally decided, a disappointed litigant is free to seek review of that decision in the court of appeals" regardless of whether any of the other consolidated cases remain pending. *Hall*, 138 S. Ct. at 1131. When the district court dismissed the IP entities from the 70 case and deconsolidated the cases, it terminated all the claims in the 70 case, making that dismissal a final, appealable judgment. *See id.* at 1124.

The more difficult question, however, is whether our jurisdiction extends to the two interlocutory orders—vacating the prior allowance of the 3AC and striking the 4AC—issued while the 400 and 70 cases were still consolidated. Generally, "a party may obtain review of prejudicial adverse interlocutory rulings upon his appeal from adverse final judgment, at which time the interlocutory rulings (nonreviewable until then) are regarded as merged into the final judgment terminating the action." *Dickinson v. Auto Ctr. Mfg. Co.*, 733 F.2d 1092, 1102 (5th Cir. 1983); *see also* 28 U.S.C. § 1291. Here, both orders that Diece-Lisa appeals were issued while the 400 and 70 cases were consolidated, without distinguishing between their applicability to one or the other case. With a final judgment issued in the 70 case but not the 400 case, the question is whether these interlocutory orders "merged into" the final judgment in the 70 case as opposed to some future, hypothetical final judgment in the 400 case.[8]

---

[8] While interlocutory orders could conceivably relate equally to two or more cases that have been consolidated, as discussed below, that is not the situation here. We therefore need not address this potentially difficult conceptual problem.

No. 17-41268
c/w No. 17-41271

Defendants argue that the orders from the consolidated case "can only be reviewed on appeal from a final judgment in the [400] case, which remains to be tried." They claim that Diece-Lisa's motions were filed "in *both* of the consolidated actions," and because only one of the formerly consolidated actions has resulted in a final judgment, the orders in the consolidated case are not yet reviewable. Diece-Lisa argues that the orders are reviewable because the orders were "effectively" rulings "in the 70 case . . . made final when the 70 case was dismissed." Diece-Lisa emphasizes that the theories advanced and the New Parties added in the 3AC demonstrate that the 3AC was part of the 70 case, not the 400 case.

When cases are consolidated, their "merger is never so complete in consolidation as to deprive any party of any substantial rights which he may have possessed had the actions proceeded separately." *Hall*, 138 S. Ct. at 1130. Moreover, "the parties to one case [do] not become parties to the other by virtue of consolidation[, and] the right of each to pursue his individual case on appeal should not be compromised by the litigation conduct of the other." *Id.* at 1128. Finally, "consolidation [cannot] prejudice rights to which the parties would have been due had consolidation never occurred." *Id.*

With these considerations in mind, we conclude that we have jurisdiction to review the interlocutory orders disposing of the 3AC and 4AC in the consolidated case because they can be "regarded as merged into the final judgment terminating" the 70 case.[9] *Dickinson*, 733 F.2d at 1102. Because the two interlocutory orders at issue here involve the district court's orders disposing of the 3AC and 4AC, our factual analysis centers on how those

---

[9] There is no danger that these orders will be modified pursuant to the district court's continued jurisdiction over the 400 case, as the 400 case has been stayed pending our resolution of this appeal.

complaints relate to the two constituent cases. A review of the various complaints filed in this litigation reveals that the claims and parties in the 3AC and 4AC most closely resemble and relate to those in the 70 case. Currently, the 400 case concerns Disney's retail entities selling Lotso merchandise at brick-and-mortar stores and online, while the 70 case concerns Disney's IP entities entering licensing agreements with third parties who sell Lotso-related merchandise. Before the cases were consolidated, however, in addition to claims against the IP entities, the first amended complaint in the 70 case raised claims against more than 80 unnamed Disney subsidiaries concerning, inter alia, the use of the Lotso character in theme parks, at resorts, and on cruise ships. The parties later stipulated to dismissal of those subsidiaries, leaving the 70 case with only the IP entities as defendants. The 3AC added ten additional Disney subsidiaries, the New Parties, as defendants and broad new claims alleging misuse of the Lotso character in forums ranging from Disney on Ice to resorts to cruise ships. With the 3AC, then, Diece-Lisa revived many of the claims and parties from the earlier complaint in the 70 case.[10] Similarly, with the 4AC, Diece-Lisa attempted to resurrect the 3AC's character-based infringement claims and assert new theories of liability. Those claims and theories were directed at the IP entities—DEI and DCP— the only defendants in the 70 case. A fact-based review of the challenged orders, then, supports a finding that the interlocutory orders are reviewable upon a final judgment in the 70 case.[11]

---

[10] The New Parties were: Buena Vista Home Entertainment, Inc.; Walt Disney Studios Motion Pictures; Buena Vista Theatrical Group, Ltd.; Disney Interactive Studios, Inc.; Disney Licensed Publishing – Disney Book Group, LLC; Walt Disney Records; Disney Destinations, LLC; Walt Disney Parks & Resorts U.S., Inc.; Magical Cruise Co., Ltd.; and Magic Kingdom, Inc.

[11] Our analysis here, in which we engage in a fact-bound determination of whether an interlocutory order relates more to one case or another, has revealed that the 3AC and 4AC do not appear to affect the rights of the parties in the still-pending 400 case (the retail

No. 17-41268
c/w No. 17-41271

We also note that the primary considerations underlying the finality requirement are "the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other." *United States v. Miss. Power & Light Co.*, 638 F.2d 899, 903 (5th Cir. 1981) (quoting *Gillespie v. U.S. Steel Corp.*, 379 U.S. 148, 152-53 (1965)). Our review of the 3AC and 4AC rulings now does not create piecemeal review because Diece-Lisa is entitled to immediate review of the district court's final judgment in the 70 case. *See Hall*, 138 S. Ct. at 1131 ("[W]hen one of several consolidated cases is finally decided, a disappointed litigant is free to seek review of that decision in the court of appeals."). Further, the 400 case concerns retail merchandising claims that do not pertain to the New Parties and do not affect their interests, and thus more inconvenience would result from a delay of our review of the interlocutory orders until a final judgment in the 400 case because the orders are not related to the 400 case.

Because the broader trademark claims of the 3AC and the 4AC closely resemble the allegations in the 70 case and because the underlying purposes of the finality rule would not be served by our awaiting a final judgment in all the consolidated cases to exercise appellate review, we conclude that Diece-Lisa may obtain review of these adverse interlocutory rulings in its current appeal from the adverse final judgment in the 70 case. *See Hall*, 138 S. Ct. at 1131; *Dickinson*, 733 F.2d at 1102; *Miss. Power*, 638 F.2d at 903; 15A WRIGHT & MILLER, FED. PRAC. & PROC. JURIS. § 3913.

---

entities). Accordingly, we have no occasion in this case to consider whether a different result might follow if our review of an interlocutory order would affect another, still pending case. Moreover, these orders will not be modified pursuant to the district court's continued jurisdiction over the 400 case, as the 400 case is stayed pending our resolution of this appeal.

No. 17-41268
c/w No. 17-41271

## III.

Diece-Lisa argues that the district court erred in concluding it lacked personal jurisdiction over the IP entities. The district court concluded that the activities of the IP entities—granting non-exclusive licenses to third-party licensees who conduct business in Texas and exerting quality control over those licensees—were insufficient to trigger personal jurisdiction over the IP entities. In addition to its licensor argument rejected by the district court, Diece-Lisa also argued in the district court that the IP entities were subject to personal jurisdiction because they are part of the "unified Disney company"— if the district court had jurisdiction over the retail entities, Diece-Lisa argued, it necessarily had jurisdiction over the IP entities as well because all Disney subsidiary entities are part of the unified Disney company. The district court did not explicitly address this argument, but nonetheless dismissed the IP entities as defendants for lack of personal jurisdiction. Diece-Lisa presents these same arguments on appeal. Because we conclude that Diece-Lisa's arguments based on these two novel theories are without merit, we affirm.

We review the district court's dismissal for lack of personal jurisdiction de novo. *Alpine View Co. v. Atlas Copco A.B.*, 205 F.3d 208, 214 (5th Cir. 2000). "Where a district court dismisses for lack of personal jurisdiction without a hearing, as in this action, we review the dismissal to determine whether the plaintiff presented sufficient evidence to support a prima facie case supporting jurisdiction." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001). We accept as true Diece-Lisa's uncontroverted, non-conclusory factual allegations and resolve all controverted allegations in its favor. *See id.*

A federal court sitting in diversity in Texas may exercise personal jurisdiction over a foreign defendant if permitted by (1) the Texas long-arm

statute, and (2) the due process clause of the Fourteenth Amendment. *Johnson v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). "Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." *Id.* Federal due process is satisfied if two requirements are met: (1) "the non-resident purposely availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the state"; and (2) "the exercise of jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994)). The "purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (cleaned up). A defendant's "minimum contacts" may give rise to either general or specific jurisdiction. *Id.* We therefore analyze each in turn.

## A.

A court has general jurisdiction over a corporate defendant where the corporation's "affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State," the paradigm examples of which are the corporation's place of incorporation and principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (cleaned up). DEI is incorporated in Delaware, DCP is incorporated in California, and both have their principal places of business in California. Neither DEI nor DCP has an office, mailing address, place of business, bank account, or real property in Texas. DEI has no employees in Texas, while three of DCP's approximately 770 employees work remotely from Texas. Neither DEI nor DCP sells any goods in Texas, including any goods based on Lotso or other characters from

*Toy Story 3.* These uncontested facts fail to reflect that either entity's principal place of business or place of incorporation is Texas, and the IP entities' contacts with the Eastern District of Texas are not otherwise "so continuous and systematic as to render [them] essentially at home" there. *Id.*

**B.**

Specific jurisdiction "encompasses cases in which the suit arises out of or relates to the defendant's contacts with the forum." *Id.* at 127. Specific jurisdiction exists when two circumstances are met: (1) "a nonresident defendant has purposefully directed its activities at the forum state," and (2) "the litigation results from alleged injuries that arise out of or relate to those activities." *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018) (quoting *Walk Haydel & Assocs. v. Coastal Power Prod. Co.*, 517 F.3d 235, 243 (5th Cir. 2008)). "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)) (internal quotation marks omitted). "[T]he relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Id.* at 284 (quoting *Burger King*, 471 U.S. at 475).

Diece-Lisa does not meaningfully argue that the Texas contacts of the IP entities alone are sufficient to support personal jurisdiction. Instead, Diece-Lisa presents two theories involving Texas contacts of third parties with whom the IP entities interact to support the exercise of specific jurisdiction over the IP entities, which we term the franchise theory and the licensor theory. The franchise theory posits that the entire Disney company should be treated as one franchise for purposes of personal jurisdiction. Because the district court has personal jurisdiction over some Disney subsidiaries, such as the retail

entities, Diece-Lisa argues the court also has jurisdiction over other Disney subsidiaries, such as the IP entities.  The licensor theory, on the other hand, proposes that because the district court has jurisdiction over the third parties to whom the IP entities grant licenses (their licensees), the court also has jurisdiction over the IP entities.  Both theories require us to analyze the IP entities' interactions with third parties—Disney subsidiaries under the franchise theory and licensees under the licensor theory—to determine whether those interactions support a finding that the IP entities "purposefully directed [their] activities at [Texas]." *Sangha*, 882 F.3d at 101.  We address each argument in turn.

**1.**

According to Diece-Lisa's franchise theory, because the district court has jurisdiction over Disney's retail entities[12] and "Disney presents itself in essence as one company," the Texas contacts of Disney's retail entities "support jurisdiction over the other 'segments' engaging in the overall infringing activity."  Diece-Lisa contends that "the infringement by all the corporately-interrelated Disney companies is so *interconnected* and *tightly controlled* that it is appropriate for the entire infringing Disney franchise to be held liable in a single jurisdiction in a single suit."

Generally, "the proper exercise of personal jurisdiction over a nonresident corporation may not be based solely upon the contacts with the forum state of another corporate entity with which the defendant may be affiliated." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 346 (5th Cir. 2004).  This "presumption of institutional independence . . . may be rebutted," however, "by 'clear evidence,' which requires a showing of 'something beyond' the mere existence of a corporate relationship between a

---

[12] The retail entities, DSU and DSI, have not contested jurisdiction in the 400 case.

resident and nonresident entity." *Id.* In determining whether the plaintiff "has overcome the presumption of corporate separateness" such that the corporations may be "fuse[d] . . . for jurisdictional purposes," the following factors, referred to as the *Hargrave* factors, guide our inquiry: "(1) the amount of stock owned by the parent of the subsidiary; (2) whether the entities have separate headquarters, directors, and officers; (3) whether corporate formalities are observed; (4) whether the entities maintain separate accounting systems; and (5) whether the parent exercises complete control over the subsidiary's general policies or daily activities." *Id*; *see also Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983). We have noted that "the maintenance of corporate formalities tips in favor of finding that the entities are not alter egos," even where other factors support an alter ego relationship. *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 588 (5th Cir. 2010); *see also Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 773-74 (5th Cir. 1988) ("[I]t is well-settled that where . . . a wholly owned subsidiary is operated as a distinct corporation, its contacts with the forum cannot be imputed to the parent.").

Diece-Lisa fails to allege any facts that suggest an alter ego relationship between the IP entities and the retail entities.[13] While both the IP and retail

---

[13] Diece-Lisa argues that the Walt Disney Company's characterization of itself as "a diversified worldwide entertainment company" in previous litigation and its failure to distinguish between its various subsidiaries in the public eye supports imputing contacts from one Disney entity to another. This argument is unavailing, as we have previously found that website descriptions and SEC filings referring to a corporate parent and its subsidiaries as a singular company, without more, were "insufficient to overcome the presumption of corporate separateness." *Freudensprung*, 379 F.3d at 346; *see also Special Indus., Inc. v. Zamil Grp. Holding Co.*, 578 F. App'x 325, 331-33 (5th Cir. 2014) (finding no personal jurisdiction over parent company simply "by virtue of the fact that [the parent has] subsidiaries in Texas that do business there" and that the company "holds itself out to the public as a unified company doing business in Texas"). Moreover, the cases upon which Diece-Lisa relies are non-binding and distinguishable; in those cases, the court did not rely solely on the company's public presentation in imputing contacts from a parent to its

No. 17-41268
c/w No. 17-41271

entities are subsidiaries of the Walt Disney Company and engage in business dealings with each other, there is no allegation that the entities fail to observe corporate formalities, nor any suggestion that the IP entities control the general policies or day to day activities of the retail entities. Diece-Lisa makes the conclusory assertion that "the infringement by all the . . . Disney companies is . . . interconnected and tightly controlled" but includes no facts explaining how Disney's retail entities or parent corporation exert such control over the IP entities such that jurisdiction over one corporation in the Disney enterprise could confer jurisdiction over all related entities. These conclusory allegations are insufficient for Diece-Lisa to make out a prima facie case of personal jurisdiction based on the franchise theory. *See Panda Brandywine Corp.*, 253 F.3d at 869 ("[T]he prima-facie-case requirement does not require the court to credit conclusory allegations."). Diece-Lisa has not alleged anything beyond the mere existence of a corporate relationship between the IP and retail

---

subsidiary. *See City of Greenville v. Syngenta Crop Prot., Inc.*, 830 F. Supp. 2d 550, 563-64 (S.D. Ill. 2011) (parent "made decisions about day-to-day operations" of subsidiary and companies "function[ed] more like a monolithic corporation controlled by [the parent] . . . as opposed to a group of independent though related companies"); *GSK Technolgies, Inc. v. Schneider Elec., S.A.*, No. 606CV361, 2007 WL 788343, at *2 (E.D. Tex. Mar. 14, 2007) (parent corporations "placed the accused products into the stream of commerce with the expectation that [subsidiary] products would be sold" in the forum state); *Frito-Lay N. Am., Inc. v. Medallion Foods, Inc.*, 867 F. Supp. 2d 859, 868-69 (E.D. Tex. 2012) (parent "exercise[d] control over and participate[d] fully in its subsidiaries' operations").

Diece-Lisa also argues that DEI "judicially admits" to Disney's "intertwined" relationships because, in pleadings in unrelated litigation, DEI has described "Disney, together with its subsidiaries" as "a diversified worldwide entertainment company with operations in five business segments." We have held that "judicial admissions are not conclusive and binding in a separate case from the one in which the admissions were made." *Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 329 (5th Cir. 2001) (quoting *Universal Am. Barge Corp. v. J–Chem.*, 946 F.2d 1131, 1142 (5th Cir. 1991)). Moreover, even if the statements were judicial admissions, a judicial admission of interconnectedness among Disney entities, absent some admission of facts supporting a controlling or alter ego relationship, would not compel a finding that contacts should be imputed among subsidiaries. *See Freudensprung*, 379 F.3d at 346; *Special Indus., Inc.*, 578 F. App'x at 331-33.

entities and has therefore not rebutted "the presumption of institutional independence." *See Freudensprung*, 379 F.3d at 346.

## 2.

The second theory of personal jurisdiction raised by Diece-Lisa is the licensor theory, which focuses on only one of the IP entities—DEI—as owner of Disney's intellectual property rights. DEI grants non-exclusive licenses to licensees throughout the country, including some to Disney's affiliated retail entities. These licenses allow third-party licensees to use the intellectual property owned by DEI and manufacture and sell Disney products around the country, including in Texas. Diece-Lisa argues that, as owner and licensor of intellectual property, DEI is subject to personal jurisdiction in Texas because it directed and authorized its licensees to use the infringing marks in Texas.

Neither this nor any other circuit has held that specific jurisdiction may arise solely from a defendant licensor's non-exclusive licenses to third parties who sell allegedly infringing products in the forum state, and at least one circuit has explicitly rejected such a theory. *See Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1366 (Fed. Cir. 2006) ("[O]ur case law requires that the license agreement contemplate a relationship beyond royalty or cross-licensing payment, such as granting both parties the right to litigate infringement cases or granting the licensor the right to exercise control over the licensee's sales or marketing activities."); *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1361-62 (Fed. Cir. 1998) (finding the forum contacts of licensees "insufficient" to submit licensor to personal jurisdiction where licensor had "no control over [licensees'] activities"); *see also Sinclair v. StudioCanal, S.A.*, 709 F. Supp. 2d 496, 508 n.8 (E.D. La. 2010) ("Courts routinely hold that the mere existence of a licensor-licensee relationship is insufficient to impute the contacts of a licensee on the licensor for the purpose

No. 17-41268
c/w No. 17-41271

of establishing personal jurisdiction." (cleaned up)).  We agree with the view of our sister circuit that something more than a non-exclusive licensor-licensee relationship is required to support the exercise of personal jurisdiction over the licensor.  Because Diece-Lisa has alleged no additional contacts with Texas, we decline to find personal jurisdiction exists over DEI because of its licensees' contacts in the forum state.[14]

Based on the foregoing analyses, we conclude that the district court properly declined to exercise personal jurisdiction over the IP entities.

**IV.**

Diece-Lisa contends that the district court abused its discretion by—sua sponte and without a hearing—vacating its order granting Diece-Lisa leave to file the 3AC.  Under the circumstances of this case, we agree. Consequently, we will set aside the district court's order pertaining to the 3AC and remand to the district court for further consideration and proceedings consistent with this opinion.

We have repeatedly held that a district court's failure to give notice and a hearing prior to sua sponte dismissal of a complaint is unfair and requires reversal.  *See Surety Co. v. Blevins*, 799 F.3d 366 (5th Cir. 2015); *Century Davoodi v. Austin Indep. Sch. Dist.*, 755 F.3d 307 (5th Cir. 2014); *Lozano v. Ocwen Fed. Bank, FSB*, 489 F.3d 636, 642-43 (5th Cir. 2007); *Carroll v. Fort*

---

[14] Diece-Lisa claims that DEI was "something more" than a mere licensor.  It supports this assertion, however, by describing actions of DEI that represent nothing more than the actions of a typical licensor, such as exerting quality control over the licensee.  *See Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 123-24 (5th Cir. 1973) ("The owner of a trademark has not only a right to license the use of the trademark to others, but also a concurrent duty to exercise control and supervision over the licensee's use of the mark."). Diece-Lisa does not allege any activities that indicate that DEI exerts the level of control over its licensees that might confer personal jurisdiction, such as sharing the right to litigate infringement cases with its licensees or controlling the licensee's sales.  *Cf. Breckenridge Pharm., Inc.*, 444 F.3d at 1366

*James Corp.*, 470 F.3d 1171, 1177 (5th Cir. 2006).    The actions of the magistrate judge and the district court here in vacating its prior grant of leave allowing Diece-Lisa to file its 3AC without notice or hearing had the same effect, removing the New Parties from the suit and nullifying Diece-Lisa's claims against them. *Cf. Millar v. Houghton*, 115 F.3d 348, 351 (5th Cir. 1997) (holding that "when a court is considering vacating and reversing a prior denial of summary judgment . . . the court must give the adverse party notice and an opportunity to respond").

Furthermore, this unilateral ruling appears to come at a high litigation cost to Diece-Lisa, and to a lesser extent to the defendants.  Diece-Lisa was permitted to file its 3AC, urging claims against several Disney subsidiaries, and was permitted to conduct discovery with respect to the New Parties for over a year.[15]  Moreover, the New Parties filed motions to dismiss for lack of jurisdiction, improper venue, and failure to state a claim; these motions were pending when the district court (and the magistrate judge) suddenly, without prior notice or a hearing, vacated the order allowing Diece-Lisa's 3AC.  The magistrate judge stated that he had improvidently granted leave to amend and that the 3AC threatened to radically change the nature of the case.  In his vacatur order, the magistrate judge also expressed "serious doubts about the factual underpinnings" of Diece-Lisa's theory of personal jurisdiction.  Given this expression of doubt regarding personal jurisdiction and venue—issues that were addressed in defendants' pending motions but were mooted by the court's vacatur—it appears that the district court used its inherent power to

---

[15] Diece-Lisa took numerous depositions and prepared expert reports based on claims in the 3AC.  The district court found that the expense was not wasted because discovery could be used by Diece-Lisa in "a separate action."  But as Diece-Lisa points out (and the district court conceded), the court's vacatur raises statute of limitations issues that might bar, or temporally restrict, the use of such discovery in subsequent actions.

vacate its interlocutory order as a shortcut, ridding the consolidated case of the New Parties without evaluating the court's jurisdiction over them or the validity of Diece-Lisa's claims against them.

Under these circumstances, we conclude that there appears to have been a misuse of judicial discretion. Accordingly, we vacate the magistrate judge's and district court's rulings as to the 3AC and remand with instructions for the district court to rule on defendants' motions on personal jurisdiction, venue, and failure to state a claim, and for any further proceedings the court deems appropriate and necessary.

## V.

Finally, Diece-Lisa argues that the district court abused its discretion in striking the 4AC.  We disagree.  The agreed order between the parties held that "fact discovery [was] closed" and "there [would] be no further . . . assertion of additional claims, defenses, or theories of liability or damages."  In the 4AC, Diece-Lisa violated the agreed order by raising for the first time the theory that DEI was vicariously and/or contributorily liable for the "infringement by other Disney entities and third parties."  Diece-Lisa also violated the agreed order by requesting additional discovery.  Therefore, the district court did not abuse its discretion in striking the complaint.[16]  *See Grabowski v. Carver*, 38 F.3d 5693 (5th Cir. 1994) (reviewing the district court's decision to strike for an abuse of discretion).

## VI.

In sum, the district court's orders dismissing the IP entities for lack of personal jurisdiction and striking the 4AC are AFFIRMED, while its order vacating its prior grant of leave to amend to file the 3AC is VACATED and the

---

[16] Unlike the district court's 3AC vacatur, its 4AC ruling was not sua sponte but pursuant to the defendants' motion to strike.

No. 17-41268
c/w No. 17-41271

case is REMANDED with instructions to first determine whether the district court has personal jurisdiction over the New Parties in accordance with the jurisdictional analysis provided in this opinion and rule on the other motions mooted by the vacatur of the 3AC, along with any additional rulings the district court may deem necessary to pass upon on remand.

AFFIRMED in part, VACATED in part, and REMANDED WITH INSTRUCTIONS.